NOT RECOMMENDED FOR PUBLICATION
File Name: 19a0274n.06

No. 17-2346

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

<table>
<tr><td>DAVID J. KATAJA, JR.,</td><td>)</td><td rowspan="11">

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE EASTERN
DISTRICT OF MICHIGAN</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>Petitioner-Appellant,</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>v.</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>DANA NESSEL,</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>Respondent-Appellee.</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
</table>

BEFORE:    MERRITT, CLAY, and ROGERS, Circuit Judges.

ROGERS, Circuit Judge. When David Kataja was twenty years old, he touched the breast of a twelve-year-old girl for a few minutes.[1] He was convicted of sexually assaulting a minor and given a prison sentence of 28.5 months to 15 years, of which he served 11 years. After Kataja's conviction, a defense witness and her sister signed affidavits stating that the victim had recanted her sexual assault allegation before Kataja's trial. Kataja relied on the affidavits to seek habeas relief, arguing that his trial and appellate counsel were constitutionally ineffective for failing to discover the recantation testimony. The district court rejected Kataja's claims due to the fact that the defense witness's affidavit conflicted with her trial testimony. Because Michigan's state courts could have reasonably relied on this ground for rejecting Kataja's claims for ineffective assistance

---

[1] Kataja's suit previously named the former Michigan Attorney General, Bill Schuette, as the respondent. We have substituted the new Michigan Attorney General, Dana Nessel, in accordance with FED. R. CIV. PROC. 25(d).

of trial and appellate counsel, the district court properly denied habeas relief under the very limited scope of review mandated for federal habeas review of state court determinations in this context. Kataja's other habeas claims also lack merit.

## I.

David Kataja met twelve-year-old J.K. in the fall of 2006 through Kataja's girlfriend, Lisa Mascaro. J.K. was also "really good friends" with Kataja's younger brother, Matt. At the time, Kataja was twenty years old, and he became close friends with J.K. They would hang out "almost everyday," in addition to calling each other and texting messages such as "I love you" at night. Kataja frequently gave J.K. alcohol. He "told [J.K.] almost everyday online that he wanted to be with [her]," and he would occasionally "h[o]ld" J.K. and kiss her on the lips.

The incident giving rise to Kataja's conviction happened in December 2006. Just before Christmas, J.K. visited Kataja at his house after he picked her up from middle school. Aaron Brannon, one of Kataja's friends, was at the house with Matt playing video games on a computer.[2] After spending time outside on the roof, J.K. and Kataja returned to sit on a couch located in the same room as Matt. The couch was behind the computer, so that J.K. and Kataja were facing in the same direction as Matt. J.K. testified that Matt was wearing headphones covering one of his ears, but both Brannon and Matt denied wearing headphones. Although Brannon was in the house, J.K. claimed that he only came into the room for approximately a half hour to play video games with Matt. Brannon, however, testified that he had been in the room "for about two hours" and that J.K. and Kataja were "in [his] field of view the entire time."

---

[2] In a statement that she made to a Care House interviewer before trial, J.K. said that Kataja and Matt were the only two people at the house when the assault occurred. J.K. also failed to mention Brannon's presence in the home during her interview with Officer Edward Pilch.

While they were sitting on the couch, Kataja attempted to "put his hand up [J.K.'s] shirt" and touched J.K.'s stomach underneath her clothing. J.K. successfully "pull[ed] him away," but Kataja then repeated the attempt. At that point, J.K. testified that she "couldn't get him away." Kataja proceeded to touch one of J.K.'s breasts with his hand for "a few minutes." The incident ended when Kataja "just took his hand out of [her] shirt." According to J.K., Brannon was not in the room when the incident happened. J.K. claimed that Matt was in the room, but he was "talking to people playing the video games online" in front of the computer. As a result, he did not turn around when Kataja touched J.K. During the course of the night, J.K. testified that Kataja gave her "two or three Mike's Hard Lemonades" to drink.

Initially, J.K. didn't tell anyone about the assault. She "knew it was wrong the whole time," but she "didn't want to really ruin" her friendship with Kataja. However, shortly after the assault happened, J.K. and Kataja had an "extremely loud" argument. The fight convinced J.K. that "there was no reason to hold it back now," so she told Mascaro about the assault a couple of days after it happened. J.K. later filed a police report with Milford Officer Edward Pilch. Sometime in the winter of 2007, J.K. was interviewed by a specialist from Care House, an agency that assists families and children in cases involving allegations of sexual abuse.

In August 2007, Kataja was tried before a jury in Michigan state court on three criminal counts: (1) second-degree criminal sexual conduct, in violation of Mich. Comp. Laws § 750.520c(1)(a); (2) attempted second-degree criminal sexual conduct, in violation of Mich. Comp. Laws § 750.520c(1)(a) and Mich. Comp. Laws § 750.92; and (3) furnishing alcohol to a minor, in violation of Mich. Comp. Laws § 436.1701. During the trial, the Government called two witnesses in addition to J.K. The first, James Tawse, was a close friend of Kataja's who testified that Kataja had previously told him that he "loved" J.K. and that "he would wait for her." The

second, Tricia Schuster, was a forensic interviewer from Care House who testified about the agency's protocol for conducting interviews on children alleging to have been victims of sexual abuse. Although Schuster did not personally interview J.K., she testified that the interviewing protocols were followed in J.K.'s case. When asked on cross-examination whether she is aware of any child's lying to a Care House interviewer, Schuster responded that she had not "been told of anything like that" with respect to the approximately one thousand interviews in which she participated.

The defense responded by calling five witnesses. For the purposes of this appeal, two portions of the defense testimony are relevant. First, Kataja's counsel asked Officer Pilch about his prior relationship with J.K., and Pilch responded by testifying that he had "had contact" with J.K. prior to her sexual assault allegation "on several occasions." Although Pilch did not elaborate on the nature of his prior contacts with J.K., he stated that he "had more contact with [J.K.] than I have most juveniles that I've encountered thus far in my employment." Second, the defense called Lindsey Sutterfield, a former friend of J.K.'s, and asked her whether J.K. had "ever t[old] [Sutterfield] that something happened with David Kataja." Sutterfield responded: "No." Sutterfield also testified that she never told J.K. that Kataja sexually assaulted her, which contradicted J.K.'s testimony that Lindsey said that "later on [Kataja] had done the same thing to Lindsey."

On September 5, 2007, the jury convicted Kataja of all counts. Kataja was sentenced to 28.5 months to 15 years on the first count for criminal sexual conduct, 2 years to 5 years on the second count for attempted criminal sexual conduct, and 60 days on the third count for furnishing alcohol to a minor.

**A.**

After Kataja's conviction, his appellate counsel filed a post-conviction motion in the trial court seeking discovery on J.K.'s prior contacts with law enforcement, along with a motion for a new trial based on the ineffectiveness of Kataja's trial counsel. The trial court held a hearing on the post-conviction motions, during which Kataja's appellate counsel reiterated her request for discovery on police reports related to J.K. and proposed that the court review such evidence *in camera* to determine its relevance. Instead, the trial court adjourned the motions so that appellate counsel could file a Freedom of Information Act ("FOIA") request for the police records.

Kataja's appellate counsel filed a supplement that included a response to her FOIA request. The trial court then held a second hearing on the post-conviction motions. Although Kataja's counsel had received police records from the Milford Police Department, they were heavily redacted. One such record contained a report involving an allegation of sexual abuse against a different man, William Strachen, but the redactions made it unclear whether J.K. was involved. The trial court adjourned the second hearing without issuing an order. Kataja's appellate counsel responded by filing a second supplemental pleading, in which she argued that "there was no basis for the trial court to decline to hold an in camera hearing as to the discoverability" of the police reports. Such a refusal violated Kataja's "rights to discovery in the criminal case," which appellate counsel claimed should "t[ake] priority over any private rights under FOIA."

In a third hearing, the state trial court denied Kataja's motion for a new trial and request for discovery. It determined that reviewing the police records *in camera* would violate FOIA, that the reports would not be admissible, and that trial counsel was not ineffective in failing to obtain the reports. The court also declined to order an evidentiary hearing on whether Kataja's trial counsel was ineffective.

**B.**

Kataja appealed his convictions in the Michigan Court of Appeals. First, Kataja argued that he should receive a new trial due to the ineffectiveness of his trial counsel on the following grounds: (1) failure to thoroughly investigate; (2) failure to object to inadmissible character evidence; (3) failure to object to Schuster's unqualified testimony; and (4) failure to object to prosecutorial misconduct. Second, Kataja claimed that the "trial court erred in denying [his] post-trial motion for discovery" and declining to disclose J.K.'s police reports or review them *in camera*.

The Michigan Court of Appeals affirmed Kataja's convictions. It determined that trial counsel's failure to investigate J.K.'s prior police records did not render him ineffective, in part because Kataja offered nothing more than speculation about the value such records would have held for his defense. With respect to the redacted police report containing a prior sexual assault allegation, the court of appeals concluded that it could not "have shown that the victim previously made a false [sexual assault] allegation" because Kataja did not produce evidence that J.K. was the complainant or that the prior allegation was false. The court determined that the trial court did not abuse its discretion in denying Kataja's motion for discovery for similar reasons. According to the court of appeals, if there were evidence that J.K. made a prior false allegation of sexual misconduct, then "it would not be subject to the rape-shield law." However, "prior to introducing testimony" regarding such a prior false allegation, "a defendant must first make an offer of proof, showing with concrete evidence that the prior accusation was false." Kataja did not do so. The court stated that an affidavit testifying "as to whether the victim had made the allegation" and whether the allegation was false could support an offer of proof. But the court cautioned that such an affidavit "would not necessarily meet the 'concrete evidence' standard."

The Michigan Supreme Court denied Kataja's application for leave to appeal in 2010. After the denial, Kataja's counsel obtained affidavits from seven witnesses offering potentially exculpatory information. The first group of affiants testified that J.K. had recanted her sexual assault allegation against Kataja. Two affiants—Lindsey Sutterfield and Leah Sutterfield— claimed that J.K. recanted the allegation in July 2007, while Joe Kerby claimed that J.K. recanted in 2008. The Sutterfield affidavits both contained an assertion of their willingness to testify at trial, whereas Kerby's affidavit did not. Brian Strunk and Autumn Rosa claimed that J.K. had recanted the allegation at an unknown time, and neither of them asserted a willingness to testify.

The second group of affiants testified that J.K. had accused another man, William Strachen, of sexual assault. Lindsey Sutterfield claimed that J.K. told her that Strachen "took her under his trailer and molested [J.K.]," without specifying when J.K. reported the incident. Leah Sutterfield similarly claimed that J.K. told her about the allegation against Strachen "before the Kataja trial," as did James Tawse, one of Kataja's former "good friends." William Strachen also submitted an affidavit, in which he claimed that a private investigator told him that "[J.K.] told some of her friends that [Strachen] molested her." The investigator also disclosed a copy of a "heavily redacted" police report appearing to show that Strachen "told a friend of [his neighbor] Tracy's daughter that Tracy's daughter had been touching [him] inappropriately. Strachen denied the allegations, but he did not assert a willingness to testify in his affidavit.

Kataja filed a petition for writ of habeas corpus and a motion to stay the habeas proceedings in the Eastern District of Michigan in 2011. The district court granted the motion to stay, thereby permitting Kataja to return to state court to exhaust issues based on the newly obtained affidavits.

## C.

Kataja filed a motion for relief from judgment in Oakland County Circuit Court pursuant to Mich. Court Rule 6.501 *et seq.*, which permits defendants to obtain post-conviction relief for issues not raised on direct appeal if they demonstrate both "good cause for failure to raise the issues" and "actual prejudice from the alleged irregularities." In his motion for relief, Kataja argued that his convictions should be set aside on the following grounds: (1) ineffectiveness of trial and appellate counsel; (2) newly discovered evidence of J.K.'s recantation; (3) prosecutorial misconduct; (4) violation of the Double Jeopardy clauses of the state and federal constitutions; (5) deficient jury instructions; and (6) failure to present evidence of J.K.'s prior false allegation of sexual misconduct against Strachen. Kataja also claimed that ineffective assistance of appellate counsel constituted "good cause" for his failure to raise the issues on direct appeal.

The state trial court denied the motion. Multiple portions of the trial court's opinion are relevant for the purposes of this appeal. First, the trial court rejected Kataja's claim that the newly discovered evidence warranted a new trial. The court determined that the affidavits would not make a different result on retrial "probable," given that the jury had already heard testimony impeaching J.K. and nonetheless "found complainant's testimony regarding [the assault] to be credible." The court also noted that some of the affiants were unable to recall when J.K.'s recantation occurred, and that the "defendant has not shown whether the evidence could have been produced at trial." With respect to the affidavits claiming that J.K. had previously accused Strachen of sexual assault, the trial court concluded that the evidence of a false allegation was not sufficiently concrete, and that Kataja therefore had failed to show that the evidence would be admissible at trial.

Second, the trial court rejected Kataja's claim that a new trial was warranted due to the ineffectiveness of his trial counsel. The court was not persuaded that the trial counsel's failure to present testimony from Lisa and Lindsey Sutterfield about J.K.'s recantation in July of 2007 constituted ineffective assistance of counsel for the following reasons: (1) Kataja did not overcome the presumption that trial counsel's decision not to call Leah Sutterfield was sound trial strategy; (2) the recantation testimony was cumulative of impeachment testimony already presented at trial; and (3) trial counsel's failure to ask Lindsey Sutterfield, one of the defense witnesses, about J.K.'s recantation was not unreasonable. Furthermore, the court determined that trial counsel's failure to discover testimony about the prior sexual assault allegation against Strachen did not constitute ineffective assistance of counsel. Due to the insufficient concrete evidence of the falsity of the allegations, the court concluded that any such testimony "would not have been admissible" at trial.

After the trial court's denial of his motion for relief, Kataja filed a timely application for leave to appeal in the Michigan Court of Appeals. The Court of Appeals denied the application in a short order asserting that the reason for the denial was Kataja's "fail[ure] to meet the burden of establishing entitlement to relief under MCR 6.508(D)." The Michigan Supreme Court later denied Kataja's application for leave to appeal in a one-sentence decision. Like the Court of Appeals, the Michigan Supreme Court cited Kataja's "fail[ure] to meet the burden of establishing entitlement to relief under MCR 6.508(D)" as the reason for the denial.

**D.**

Kataja returned to the district court and filed an amended petition for habeas corpus in July of 2015. The petition alleged the following claims for habeas relief: (1) prosecutorial misconduct; (2) ineffective assistance of trial counsel, in part due to trial counsel's failure to fully investigate and obtain discoverable information about J.K.'s prior false sexual assault allegation and about her

"many contacts" with law enforcement; (3) ineffective assistance of appellate counsel, based on appellate counsel's failure to raise the ineffective-assistance-of-trial-counsel claim on direct appeal and on appellate counsel's failure to obtain the affidavits attesting to J.K.'s recantation and prior allegation against Strachen; (4) violation of due process due to the trial court's denial of Kataja's motion for post-trial discovery; and (5) deprivation of the right to be free from double jeopardy under the Fifth Amendment.

The district court granted Kataja's motion to lift the previous stay on the habeas proceedings and reopened the case. The court then denied habeas relief to Kataja on all of his claims. Although there was a procedural-default issue, the district court declined to rule on it. Instead, the district court addressed the merits of Kataja's habeas claims, determining that it was reasonable for the state court to conclude that "counsel's failure to discover recantation evidence or an alleged prior false allegation was not ineffective assistance of counsel."[3] With respect to the recantation evidence, the district court limited its analysis to the Sutterfield affidavits. Unlike the state trial court, the district court did not believe that the recantation evidence was cumulative of the impeachment testimony presented at trial, since the evidence impeaching J.K.'s credibility did not "offer[ ] the same exculpatory value as testimony that [J.K.] recanted her allegations." The district court nonetheless concluded that "the second rationale proffered by the state trial court"—namely, that "a reasonably competent attorney" would have expected the Sutterfield sisters to volunteer that J.K. recanted during their trial testimony—"provide[d] a reasonable basis for rejecting Kataja's claim."

---

[3] Although the district court treated the failure to discover the recantation evidence as a potential ground for ineffective assistance of trial counsel, it appears that Kataja only argued that the recantation evidence was a ground for ineffective assistance of appellate counsel in his Amended Petition for Habeas Relief. Kataja's ineffective-assistance-of trial-counsel claim relied instead on trial counsel's failure to obtain evidence of J.K.'s prior false allegation against Strachen and her contacts with law enforcement—not on trial counsel's failure to obtain affidavits attesting to J.K.'s recantation.

With respect to the evidence about a prior false sexual assault allegation against Strachen, the district court determined that it was "not unreasonable" for the state trial court to conclude that the evidence lacked the concreteness necessary to render it admissible under Michigan law. Because the "only evidence of falsity [wa]s Strachen's unsurprising denial of having molested anyone," it "was not unreasonable for the trial court to deny relief."

Although the district court denied habeas relief on all of Kataja's claims, it granted a certificate of appealability with respect to "whether Petitioner established that his trial counsel was ineffective for failing to present evidence that [J.K.] recanted and made prior false allegations of rape." Kataja then filed a motion in the Sixth Circuit to expand the certificate of appealability. The Sixth Circuit granted Kataja's application with respect to one claim: whether Kataja's "appellate counsel was ineffective for not preserving evidence from witnesses who denied that JK recanted her allegations against Kataja and made prior false allegations of rape." This appeal followed.

## II.

Pursuant to the certificate of appealability, Kataja seeks habeas relief on two grounds: (1) ineffective assistance of trial counsel, due to trial counsel's failure to present evidence of J.K.'s alleged recantation and of the prior sexual assault allegation against Strachen; and (2) ineffective assistance of appellate counsel, due to appellate counsel's failure to appeal all grounds for the claim of ineffective assistance of trial counsel and to obtain notarized affidavits attesting to J.K.'s recantation and prior sexual assault allegation.

Kataja did not rely on the affidavits in question on direct appeal in Michigan state court, in violation of Mich. Ct. R. 6.508(D)(3). Although this raises a procedural-default issue, "[t]he U.S. Supreme Court has held that federal courts are not required to address a procedural-default issue

before deciding against the petitioner on the merits." *Hudson v. Jones*, 351 F.3d 212, 215 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)). Because Kataja's habeas claims fail on the merits, we accordingly need not determine whether they are procedurally defaulted.

## A.

Reasonable arguments could be made to support the state court's determination that Kataja's trial counsel was not constitutionally ineffective under *Strickland v. Washington*, 466 U.S. 668 (1984), despite counsel's failure to present trial testimony about J.K.'s recantation or evidence of J.K.'s false sexual assault allegation against Strachen. Habeas relief is unwarranted on this ground.

Kataja has not presented enough evidence to show that, contrary to the determination of the Michigan trial court, his trial counsel's failure to present trial testimony of J.K.'s alleged recantation was objectively unreasonable. When reviewing a state court's denial of an ineffective-assistance-of-counsel claim under *Strickland*, federal courts undertake a "doubly deferential" standard of review. *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015). The *Strickland* analysis is itself "highly deferential" to counsel's performance. *Strickland*, 466 U.S. at 689. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of professional assistance," and the defendant "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). When reviewing a state court's decision under 28 U.S.C. § 2554(d), "review must be doubly deferential in order to afford both the state court and the defense attorney the benefit of the doubt." *Woods*, 135 S. Ct. at 1376. "The question [on habeas review] is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington v. Richter*, 562 U.S. 86, 105 (2011).

The state court's determination that trial counsel was not constitutionally ineffective for failing to produce testimony regarding J.K.'s purported recantation satisfies that standard. As the Michigan trial court recognized, the affidavits from Kerby, Strunk, and Rosa are problematic.[4] For one thing, they do not state that J.K. recanted her allegation before trial. Kerby testified that J.K. recanted in 2008, while Strunk and Rosa each testified that J.K. recanted at an unknown time. Demonstrating that trial counsel was constitutionally ineffective requires a showing of both deficient performance and prejudice to the defense. *See Strickland*, 466 U.S. at 687. Trial counsel's performance could not have been deficient for failing to discover and present evidence of J.K.'s recantation to Kerby, Strunk, or Rosa, given that there is no evidence that the recantation occurred before trial. Such a conclusion is in line with the state court's determination that Kataja failed to show prejudice because it is not clear that the recantation evidence from Kerby, Strunk, and Rosa could have been produced at trial, a determination that is not unreasonable.

Although the affidavits from the Sutterfield sisters state that J.K. recanted before trial and that the sisters were willing to testify to that fact,[5] Lindsey Sutterfield's trial testimony calls both affidavits into question. During Kataja's trial, Lindsey testified on behalf of the defense. When trial counsel asked her whether J.K. had told her about the alleged sexual assault, Lindsey responded: "No." That trial testimony is inconsistent with Lindsey's corrected affidavit, which claims that J.K. had recanted the sexual assault allegation before trial in July of 2007. As a result, it was reasonable for the Michigan trial court to conclude that trial counsel was not ineffective for failing to follow up by asking about J.K.'s recantation. Such a question would have been aimed

---

[4] The district court limited its analysis of the recantation evidence to the Sutterfield affidavits. However, we review all of the affidavits attesting to J.K.'s recantation, given that the outcome of the analysis remains the same.

[5] The Sutterfield sisters initially provided affidavits claiming that J.K. recanted in July of 2008, after Kataja's trial and conviction. However, they later corrected the affidavits to state that the alleged recantation happened in July of 2007.

at eliciting an answer that would have been flatly inconsistent with Lindsey's testimony, and it would not have been unreasonable for trial counsel to expect a defense witness to volunteer information about the alleged victim's recantation.

Any doubt about whether Lindsey's sister Leah would have testified differently is also not enough to overcome the substantial deference that we owe to the state court. Leah's affidavit provides the same account of J.K.'s recantation as Lindsey's affidavit, with both sisters claiming that J.K. recanted "a few days before the 4th of July" when J.K. came to their house to lend Leah some clothing. The fact that Lindsey made no mention of the recantation during trial—and indeed testified in a way that was inconsistent with such a recantation—raises reasonable questions about whether Leah would have testified differently had she been called as a witness. Furthermore, it was not unreasonable for the state court to defer to trial counsel's decision to refrain from having Leah testify, given that such a decision is normally a matter of trial strategy within counsel's discretion. It was not unreasonable for the state court to conclude that trial counsel was constitutionally effective, despite his failure to discover and present Leah's testimony about J.K.'s alleged recantation.

With respect to the affidavits testifying that J.K. falsely accused Strachen of sexual assault, a reasonable argument could be made supporting the state court's determination that trial counsel's failure to present evidence relating to that allegation was not objectively unreasonable under *Strickland*. The Michigan trial court concluded that the evidence supporting the existence of a prior false sexual assault allegation against Strachen was insufficiently concrete to be admissible under Michigan law. "[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."

*Bradshaw v. Richey*, 546 U.S. 74, 76 (2005). We are accordingly obligated to follow the state court's evidentiary conclusion.

The inadmissibility of the prior-allegation evidence means that Kataja cannot satisfy his burden of showing prejudice under *Strickland*, which requires the defendant to establish "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 494. Given that the evidence pertaining to the prior allegation of sexual assault would have been inadmissible, the evidence could not have affected Kataja's trial. As a result, the Michigan trial court's denial of Kataja's claim for ineffective assistance of trial counsel on the basis of the sexual assault allegation against Strachen was not unreasonable. Habeas relief is unwarranted on this ground.

**B.**

Appellate counsel was not constitutionally ineffective for failing to allege all grounds for ineffective assistance of trial counsel on direct appeal, nor was she ineffective for failing to submit notarized affidavits about J.K.'s recantation and sexual assault allegation against Strachen with Kataja's motion for a new trial.

Because Kataja's claim for ineffective assistance of trial counsel lacks merit, appellate counsel was not constitutionally ineffective for failing to raise the argument on direct appeal. Under the *Strickland* standard, which is applicable to claims for ineffective assistance of appellate counsel, a petitioner must show deficient performance and prejudice to prevail. *Thompson v. Warden, Belmont Corr. Ins.*, 598 F.3d 281, 285 (6th Cir. 2010). When a claim lacks merit, the "appellate counsel's failure to raise that claim on direct appeal cannot be deemed constitutionally deficient performance." *Willis v. Smith*, 351 F.3d 741, 746 (6th Cir. 2003). In light of the analysis in Part II.A, Kataja's claim for ineffective assistance of trial counsel based on trial counsel's failure

to present evidence of J.K.'s recantation and of her prior sexual assault allegation fails. Habeas relief based on appellate counsel's failure to raise such an unmeritorious claim is therefore unwarranted.

Appellate counsel's failure to obtain notarized affidavits testifying about the recantation and prior sexual assault allegation similarly falls short of supporting habeas relief. The affidavits attesting to J.K.'s recantation suffer from multiple problems. As discussed, the Kerby, Strunk, and Rosa affidavits do not state that J.K.'s alleged recantation happened before trial. While the Sutterfield sisters claim they would have been willing to testify about a recantation that occurred in 2007, Lindsey Sutterfield did testify for the defense in a way that was inconsistent with her later account of J.K.'s recantation. With respect to the Strachen allegation, the Michigan trial court determined that the relevant affidavits would have been inadmissible at trial. It is therefore unlikely that attaching the affidavits on direct appeal would have convinced the state court to grant Kataja a new trial. "Counsel's failure to raise an issue on appeal is ineffective assistance only if there is a reasonable probability that inclusion of the issue would have changed the result of the appeal." *Howard v. Bouchard*, 405 F.3d 459, 485 (6th Cir. 2005). In light of the problems already discussed, the affidavits do not satisfy that standard. A reasonable argument could be made supporting the Michigan trial court's denial of Kataja's claim for ineffective assistance of appellate counsel on this basis.

## III.

The district court's judgment is affirmed.